## McNEIL v. MAYHEW.

(District Court, E. D. New York. May 13, 1925.)

Factors ⬤⇒42—Correspondence held to show meeting of minds on guaranty of price.

Correspondence between the parties *held* to establish a meeting of minds in contract whereby broker guaranteed shipper of lumber a particular price.

At Law. Action by Walter McNeil against Zeb Mayhew. On plaintiff's motion to strike out amended answer and for summary judgment. Motion granted.

Judgment affirmed 10 F.(2d) 396.

Zabriskie, Sage, Gray & Todd, of New York City (George Zabriskie and George Gray Zabriskie, both of New York City, of counsel), for plaintiff.

Kelly, Hewitt & Harte, of New York City, for defendant.

GARVIN, District Judge. A motion having been made before me by the plaintiff for summary judgment and having been denied, plaintiff now moves for leave to reargue. The motion is granted, and the motion for judgment will now be considered de novo.

My first conclusion, expressed in a short memorandum, was to the effect that the denials interposed by the defendant raised such an issue as required the question of the meeting of the minds to be determined upon evidence produced at a trial. The motion was not argued at great length, nor fully briefed.

In the light of the careful presentation by both sides upon the application to reargue, and of the comprehensive memoranda submitted thereafter, I have concluded that my determination of the original motion should be recalled.

Rule 113 of the Civil Practice Act of the state of New York provides that, where an answer is served in an action to recover a debt or liquidated demand arising on a contract, express or implied, the answer may be struck out and judgment entered thereon on motion, and the affidavit of the plaintiff, or of any other person having knowledge of the facts, verifying the cause of action and stating the amount claimed, and his belief that there is no defense to the action, unless the defendant by affidavit, or other proof, shall show such facts as may be deemed, by the judge hearing the motion sufficient to entitle him to defend. This provision was manifestly enacted by the Legislature to put an end to a practice, unfortunately only too common, of endeavoring to prevent a plaintiff from recovering judgment on a just demand merely by complying with the technical requirements of a denial; the defendant having no defense on the merits, nor in law, if actually forced to trial. The rule has proved effective, not only to accomplish the desired result, but also has frequently saved time and money to both parties to a suit, where it has appeared, as a result of an examination of the motion papers, that there was no real question of fact in dispute between the litigants, but merely a question of law to be decided by the court, and which could be decided quite as well upon affidavits as after a trial.

Such is the case now before the court, according to the claim of the plaintiff, and a careful examination of the facts will be helpful in leading to a correct determination of his contention. The suit is brought to recover upon two causes of action—the first, for breach of contract to pay for lumber shipped by plaintiff to defendant at an agreed price; the second, for goods sold and delivered.

On August 1st, plaintiff sent a telegram to defendant reading as follows:

"Am loading deck load two hundred thousand white pine on schooner Joan Kielburg Bridgewater next week for direct sailing New York. This nice dry two inch stock. If you can guarantee minimum price forty-two dollars, will send to you also will give you preference cargo on schooner Chautauqua. Pine from same locality as previous shipments but think better. Will load both Susan and Annabel about September first. Answer."

On August 2d, defendant answered by telegram as follows:

"Replying telegram first will guarantee forty-two delivered New York regular terms subject our commission and discount for two inch white pine lengths six foot and up log run but with mill culls out separate lots of fifty thousand feet and no Norway pine included stop what are you doing with balance of cargo in hold confirm."

On August 4th, plaintiff sent a letter to defendant which reads in part as follows:

"Messrs. Simpson, Clapp & Co., 44 Whitehall St., New York—Dear Sirs: Deck load Schr. Joan Kielburg. I have your telegram of the 2d inst. and note where you guarantee $42 delivered New York, regular terms, subject your commission and discount for 2-inch white pine, lengths 6 feet and up, log run, with mill culls out. Separate lots of 50 M feet.

"The Joan Kielburg was loading pulp in Bridgewater, and she was offered to me for a deck load at the low rate of $5.00 per M, so I decided to take her. I agreed to furnish a minimum of 200 M, but she will probably carry 225 M or more so I will probably load her to full capacity. I have also chartered the Schr. Chautauqua, now discharging coal at Lunenberg, N. S., and she will be in Bridgewater any day to load.

"Mr. Williams, my superintendent at Caledonia, had started to load out cars for the Chautauqua, so I am transferring these to the Joan Kielburg. Immediately on receiving your telegram, I called him up and advised him how you wished this deck load in separate lots of 50 M, so he is trying to arrange this, but he advises that the first lot will probably have to be 100 M, because about that quantity has gone forward to the vessel. He however, will be in Bridgewater today and see if loading can be done in line with your requirements.

"I inclose you herewith one copy of charter party and will wire the specifications in general to you as soon as I have it from Mr. Williams and will also mail a complete detailed specification when received. I trust you will be able to sell this pine for $43 or $44."

On August 5th plaintiff telegraphed defendant as follows:

"Am consigning Joan Kielburg to you. Wrote you fully yesterday."

On August 7th defendant sent this letter to plaintiff:

"We acknowledge receipt of your favor of August 4th with inclosed copy charter party of the schooner Joan Kielburg, and note your plan for loading this vessel."

Plaintiff's first telegram contains a clear offer; defendant's answer accepts in part, but calls for two new conditions, specifying a certain quality of wood and a designated manner of loading; i. e., 50,000-foot separate lots.

Plaintiff's letter, dated August 4th, acknowledges receipt of defendant's telegram of August 2d, and agrees to furnish a minimum of 200,000 feet, and states that the first lot will probably have to be 100,000 feet. There appears to be no understanding between the parties upon that point at this time. Defendant's letter to plaintiff, dated August 7th, referred to plaintiff's letter, dated August 4th, but did not take any exception to plaintiff's proposals. The court is of the opinion that it was a duty of the defendant, upon receipt of the letter of August 4th, if he was dissatisfied, to have stopped the sailing of the schooner Joan Kielburg by telegram, for it appears that on August 5th plaintiff had telegraphed that he was consigning that boat to the defendant. It is conceivable, of course, that the boat might have started before plaintiff received such a telegram, but in that event defendant could have refused to accept the lumber when it arrived.

It seems to the court that the meeting of the minds occurred with the receipt by defendant of plaintiff's letter, dated August 7th, to which he sent no reply. There was later correspondence between the parties. Under date of August 22d, defendant wrote plaintiff as follows:

"Mr. Walter McNeil, New Glasgow, Nova Scotia, Canada—Dear Sir: We acknowledge receipt of your favor, August 19th, giving loading time of the Joan Kielburg, for which we thank you.

"To our surprise this schooner arrived yesterday, before we had received the last schedule, which came later in the day. We have not been able to start this cargo yet, and find as previously advised you that some of our former customers for this pine are not interested at any price. What white pine is used today is chiefly Western pine, sorted into definite grades, dressed, and in carload lots. Due to the modern manufacture of lumber, retail yards are no longer interested in log run, whether it be in white pine, spruce, hemlock, or fir; and no matter what the stumpage may represent to the mill owners in the provinces, this is of no interest to the buyer in the retail yard."

Defendant did not raise any question with

regard to the quantity, or the manner in which the boat was loaded. If he was dissatisfied with respect to either of these points, it was manifestly his duty to bring them up for discussion without further delay, even if he had the right to do so at such a late date.

It is claimed that defendant wrote a letter to plaintiff, dated August 23d, reading as follows:

"Mr. Walter McNeil, New Glasgow, Nova Scotia, Canada—Dear Sir: As wired you yesterday, schooner Joan Kielburg arrived Thursday and should be ordered to berth today. This cargo does not comply with our offer, August 2d, which specified that this cargo should be loaded in lots of 50 M ft., and was in answer to your original offer of only 200 M ft. The first lot loaded was loaded mixed up in 100 M ft. parcel, and the last lot should not be shipped at all, as it totals 239 M ft. Furthermore, this lumber was to be log run, and of same quality and manufacture as previously shipped, and it is reported to us that there is considerable bark. The grade is low, knotty, and does not contain the clear, approximating almost entirely No. 3 barn, instead of running No. 3 barn and better to average No. 2 barn. The captain further demands a berth, so that unless we hear from you to the contrary by the 27th, making some other disposition, we will have to place this in storage for your account and risk.

"Very truly yours,

"Simpson, Clapp & Co."

In the opinion of the court, the fact that the writing of this letter is in dispute is of no consequence, for the reason that the minds of the parties had already met. On September 2d, defendant wrote plaintiff a letter reading in part as follows:

"As previously advised you, we had to discharge to a storage wharf the white pine ex Sch. Joan Kielburg, to give us more time, because there was no interest for it here at that time. We find that there is less use today than ever for this stock, and we are not at all enthusiastic about having 113 M ft. more on consignment, but we will do the very best we can. The trouble is that the Californian pine, both white and sugar, are put here so cheap by rail that even No. 3 barn can be bought at less than $40.00 in carload lots."

Then again, on September 8th, the defendant wrote the following letter, a part of which has no reference to the matter in dispute:

"We acknowledge receipt of your telegram, but have not wired you, as we had no opportunity yet to show these schedules, and we do not know what you think you should get. Despite your idea of price, we cannot obtain more than the market will pay, and your lumber is in competition with fir and spruce coming in from the Pacific Coast by steamer, and white pine from California and Idaho by rail. We have repeatedly advised you that values in this market are governed by competitive prices, and not by stumpage values in Nova Scotia. The writer got stuck when you offered $42 for the white pine on the Joan Kielburg, because we figured that one of the three previous customers would use it and we took a chance on getting $42 from them in order to get started again with you. The actual facts are that Bossert would not look at the schedule, that Cross Austin offered $33 for it, and Gates would not take it at any price.

"The vessel got here before her papers were complete, so that we had no opportunity to properly canvass the market, although we had three men on it, including the writer personally, and in order to save further demurrage, we finally stored the lumber in Newtown creek and will peddle it out by motor truck.

"The facts are simply as we have often and repeatedly advised you, there is very little call for log run, especially in white pine. This has to be sold to concerns which run a planing mill, making sash and blind stock, etc. We have canvassed every yard from New London to Philadelphia, with results as reported above. We naturally will give you $42 for the Kielburg and take what we can get; but we do not expect to get any $42 for the Chautauqua white pine. If you know anybody that will give you that, we will be very glad to turn over the white pine to them.

"We cannot help what the price for lumber is in New York, and have kept you advised monthly by market letter, and further in our correspondence with you. We can only repeat that this market does not want odd widths or lengths in any kind of lumber, yet you persist in manufacturing your lumber that way. This may sell locally, and you may get more out of the log; but as far as the American market is concerned it only reduces the value of the whole schedule more than any possible saving in log scale."

The former of these two later letters does not speak of rejecting the lumber, but rather asks for additional time. The latter letter contains nothing inconsistent with the sug-

gestion that a contract was already in existence; on the other hand, the statement therein contained, "We naturally will give you $42," clearly indicates that the defendant understood that he was obligated to plaintiff in that amount.

The plaintiff's motion for an order striking out the amended answer and for summary judgment is granted.